☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 25-910M(NJ)
JORDAN RIVER FASHION, located at 3429 W. North Avenue, Milwaukee, )
WI 53208 (PREMISES 2), to include the mailbox and all associated storage )
lockers, closets, and areas associated with PREMISES 2 located within the )
curtilage of the Subject Premises including a Mitsubishi vehicle bearing )
Wisconsin license plate VH9615 )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___5/30/2025___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Honorable Nancy Joseph___.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: ___5/16/2025 @ 10:16 a.m.___          *Nancy Joseph*
                                                              *Judge's signature*

City and state: ___Milwaukee, WI___          Honorable Nancy Joseph, U.S. Magistrate Judge
                                             *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

<u>**ATTACHMENT A**</u>

***Property to Be Searched***

The property to be searched is **JORDAN RIVER FASHION**, located at **3429 W. North Avenue, Milwaukee, WI 53208** (PREMISES 2 or "Subject Premises"), to include the mailbox and all associated storage lockers, closets, and areas associated with PREMISES 2 located within the curtilage of the Subject Premises including a Mitsubishi vehicle bearing Wisconsin license plate VH9615.

The property of **JORDAN RIVER FASHION**, 3429 W. North Avenue, Milwaukee, WI 53208, is located on the South side of W. North Avenue, East of N. 35th Street, in Milwaukee, Wisconsin. The building has blue wall paneling on the front of the business. The entrance to the property is through the front entrance on the North side of the building. There is a red lettering "JORDAN RIVER" sign above the front entrance of the property.



## ATTACHMENT B

### *Property to Be Seized*

    A.     Evidence, Fruits, and Instrumentalities of Subject offenses.

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 371 (conspiracy to commit an offense), and Title 18, United States Code , Section § 2320 (trafficking in counterfeit merchandise) (the "Subject Offenses") from May 1, 2019, to the present, described as follows:

- Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, statements, identification documents, address books, telephone directories, and keys.
- Evidence concerning the ownership and use of the electronic devices found in the Subject Premises, including without limitation, sales receipts, bills for internet access, and notes in computer manuals.
- Identification documents, correspondence, applications, loan documents, mail, account statements, bills, credit cards, financial records, and other documents in the name of, or addressed to, or referencing any person, which may be evidence of the use of aliases in the commission of fraud.
- Evidence concerning the operation of "Dutti Fashion" and "Jordan River Fashion," or other clothing, handbag, or accessories businesses.
- Financial records, including books, ledgers, credit card bills, and financial instruments related to Dutti Fashion. and Jordan River Fashion, or other clothing, handbag, or accessories businesses.
- Evidence concerning the receipt and disposition of criminal proceeds derived from the offenses, the creation and maintenance of financial accounts (including virtual currency accounts), tax returns, financial transfers and transactions, the possession of monetary instruments, and the disbursement of funds.
- Evidence concerning the statements, representations, and advertisements made to the general public, including lists of customers, communications with customers, and records of complaints and/or disputes by or about customers or prospective customers.
- Evidence concerning the link between Dutti Fashion" and "Jordan River Fashion."
- Documents referencing the names and employment of employees and/or owners of Dutti Fashion" and "Jordan River Fashion."
- Documents relating to vendors, suppliers, or sellers of goods to Dutti Fashion" and "Jordan River Fashion," including lists of vendors or sellers, communications with vendors or sellers, and records of complaints and/or disputes by or about vendors or sellers.
- Luxury clothing, handbags, and fashion accessories that appear to be counterfeit.
- Any safes, key-lock strong boxes, and other types of locked or closed containers that may contain any of the items described above, while will be opened and searched at the Subject Premises if reasonably feasible.
- Proceeds from the sale of counterfeit merchandise including bulk cash.

40

B. Computers or storage media used as a means to commit the violations described above.

1.	For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.	evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.	evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.	evidence of the lack of such malicious software;

d.	evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.	evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.	evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.	evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.	evidence of the times the COMPUTER was used;

i.	passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.	documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.	records of or information about Internet Protocol addresses used by the COMPUTER;

l.	records of or information about the COMPUTER's Internet activity,

41

including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

n. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Case 2:25-mj-00910-NJ    Filed 05/16/25    Page 6 of 49    Document 1

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>JORDAN RIVER FASHION, located at 3429 W. North Avenue, Milwaukee, WI 53208<br>(PREMISES 2), to include the mailbox and all associated storage lockers, closets,<br>and areas associated with PREMISES 2 located within the curtilage of the Subject<br>Premises including a Mitsubishi vehicle bearing Wisconsin license plate VH9615 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 25-910M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 19 U.S.C. § 1526 | Importation of Counterfeit Merchandise |
| 18 U.S.C. § 371 | Conspiracy to Commit an Offense |
| 18 U.S.C. § 2320 | Trafficking in Counterfeit Merchandise |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JULIUS KLEVINSKAS    Digitally signed by JULIUS KLEVINSKAS
Date: 2025.05.15 11:42:09 -05'00'

*Applicant's signature*

Julius Klevinskas, Special Agent, DHS-HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*

Date: __5/16/2025__

*Judge's signature*

City and state: __Milwaukee, WI__    Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Julius Klevinskas, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants for two businesses and two residences (four locations total): DUTTI FASHION LLC ("DUTTI FASHION"), the business located at 620 W. Historic Mitchell Street, Milwaukee, WI 53204 (Premises 1); JORDAN RIVER FASHION LLC ("JORDAN RIVER FASHION"), the business located at 3429 W. North Avenue, Milwaukee, WI 53208 (Premises 2); the residence located at 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3); and the residence located at 5588 S. 27th Street, Milwaukee WI 53221 (Premises 4); which are further described in Attachment A, for the items described in Attachment B.

2.       I am a sworn law enforcement officer currently employed as a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) and have been so employed since approximately January 2023. I am currently assigned to the Chicago Field Division – Milwaukee Resident Office. Since becoming a Special Agent, I have received specialized training in various aspects of law enforcement and my responsibilities include conducting investigations of alleged criminal violations of federal law. Prior to my tenure as a HSI Special Agent, I was a Diversion Investigator with the United States Department of Justice (DOJ), Drug Enforcement Administration (DEA), Milwaukee District Office, from approximately July 2019 to January 2023

3.       The facts in this  affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses.

1

This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that contraband, as well as evidence, fruits, and instrumentalities of violations of Title 18, United States Code , Section § 2320 (trafficking in counterfeit merchandise) and Title 18, U.S.C. §371 (conspiracy to commit an offense), will be found at DUTTI FASHION (Premises 1); JORDAN RIVER FASHION (Premises 2); the residence located at 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3); and the residence located at 5588 S. 27th Street, Milwaukee, WI 53221 (Premises 4); further described in Attachment A. In my training and experience, businesses keep financial and other records to assist in the functioning of their business to keep track of their profits, expenses, inventory, and for tax preparation. As such, in my experience, many businesses retain business records for several years.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

*Overview*

6.      Since approximately April 2020, Homeland Security Investigations (HSI) has been investigating AHMAD YOUSEF JUMAA ABULAWI ("AHMAD ABULAWI"), a Jordanian national, for the importation and trafficking of counterfeit goods through the operation of retail store-front businesses, in particular DUTTI FASHION, LE DUTTI FASHION, and JORDAN

2

RIVER FASHION, all located in Milwaukee, Wisconsin. U.S. Customs and Border Protection (CBP) have seized several international express consignment parcels from outside the United States destined for AHMAD ABULAWI and his businesses in Milwaukee, Wisconsin. As detailed below, the international shipments were falsely manifested and contained hats, wallets, watches, and other clothing and apparel merchandise containing counterfeit trademarks from various brand name designers, to include, but not limited to, Louis Vuitton, Jordan, Gucci, and Rolex. CBP Import Specialists have determined the manufacturer's suggested retail price (MSRP) for the seized property exceeded $1.6 million.

7.     The investigation was initiated in conjunction with Edward R. Kirby & Associates (hereinafter referred to as "Kirby"), a licensed private detective agency in the State of Illinois. Kirby represents numerous brand name companies, including designer clothing brands. Since approximately 1985, Kirby has conducted investigations on behalf of companies such as Apple, Samsung, Louis Vuitton, Nike, and others regarding the manufacturing, sale, and distribution of counterfeit trademarked merchandise. As part of this investigation, HSI Milwaukee Special Agents have been in contact with Kirby's Vice President Kevin Read regarding the counterfeit merchandise sale at DUTTI FASHION, LE DUTTI FASHION, and JORDAN RIVER FASHION. Kevin Read has been a licensed Private Detective in Illinois since 1999 and has been trained by companies to identify counterfeit products. Kevin Read is authorized to work with law enforcement regarding individuals manufacturing and distributing counterfeit trademarked items.

8.     As detailed in this affidavit, Kirby Investigators have conducted multiple covert purchases of counterfeit merchandise from locations associated with AHMAD ABULAWI and have concluded that some of the merchandise sold at these businesses was counterfeit. In October 2022, HSI Special Agents in conjunction with Kirby Investigators conducted an overt operation

3

that resulted in the seizure of hundreds of counterfeit products from businesses owned and operated by AHMAD ABULAWI.

9.    HSI Special Agents later learned that LE DUTTI FASHION had closed, and that the business was Administratively Dissolved in December 2022.

10.    In January 2024, HSI Special Agents were contacted by Kevin Read informing them that the retail store-front business DUTTI FASHION was again selling counterfeit merchandise. HSI Special Agents also learned that another retail store-front business, JORDAN RIVER FASHION, believed to be owned and/or operated by BAHADDIN ABULAWI, was selling the same and/or similar merchandise to the counterfeit merchandise observed at DUTTI FASHION. Based on email communications, it appears that BAHADDIN ABULAWI and AHMAD ABULAWI are brothers.

11.    I know from my training and experience that the sale of merchandise containing counterfeit trademarks can be very lucrative. Based on this investigation, I believe AHMAD ABULAWI, BAHADDIN ABULAWI, and other co-conspirators, known and unknown to this investigation, are knowingly importing counterfeit merchandise to multiple locations, including residences, and then selling the counterfeit merchandise for profit through the operation of retail businesses.

## *DUTTI FASHION LLC (Premises 1)*

12.    A search of the Wisconsin Department of Financial Institutions website showed that DUTTI FASHION is a Wisconsin Domestic Limited Liability Company (LLC), registered on or about September 6, 2017, entity ID D060216. The Articles of Organization showed AHMAD ABULAWI and GABRIELA FEGHIU as organizers of the business, with an address for both listed as XXXX W. College Avenue, Apt#XX, Milwaukee, WI 53221. The address for the

4

principal office was listed as 620 W. Historic Mitchell Street, Milwaukee, WI 53204 (Premises 1).

13.     The annual report for DUTTI FASHION, dated August 19, 2021, listed AHMAD ABULAWI as the manager and registered agent of the business, with the registered agent and principal office addresses listed as 620 W. Historic Mitchell Street, Milwaukee, WI 53204 (Premises 1). The nature of the business was listed as Clothes and Fashion Store. The contact individual listed was AHMAD ABULAWI, with a phone number XXX-XXX-5380 and email "adamabu782@yahoo.com." ("Adam Abu").

14.     The annual report for DUTTI FASHION, dated July 17, 2024, listed AHMAD ABULAWI as the president and registered agent of the business, with the registered agent and principal office addresses listed as 620 W. Historic Mitchell Street, Milwaukee, WI 53204 (Premises 1). The members section for the business listed only AHMAD ABULAWI.

### *LE DUTTI FASHION LLC*

15.     A search of the Wisconsin Department of Financial Institutions website showed that LE DUTTI FASHION was a Wisconsin Domestic Limited Liability Company (LLC), registered on or about November 22, 2018, entity ID L063846. The business was listed as Administratively Dissolved, with a status date of December 14, 2022.

16.     The Wisconsin Department of Financial Institutions website listed AHMAD ABULAWI as the registered agent of the business, with an address of the registered agent and principal office listed as 628 W. Historic Mitchell Street, Milwaukee, WI 53204.

### *JORDAN RIVER FASHION LLC (Premises 2)*

17.     A search of the Wisconsin Department of Financial Institutions website showed that JORDAN RIVER FASHION is a Wisconsin Domestic Limited Liability Company (LLC), registered on or about June 29, 2021, entity ID J055058. The Articles of Organization showed

5

BAHADDIN Y ABU-LAWI ("BAHADDIN ABULAWI") as the organizer of the business. The address for the principal office was listed as 3429 W. North Avenue, Milwaukee, WI 53208 (Premises 2).

18.     The annual report for JORDAN RIVER FASHION, dated July 1, 2024, listed BAHADDIN ABULAWI as the member, president, and registered agent of the business, with the registered agent and principal office address listed as 3429 W. North Avenue, Milwaukee WI 53208 (Premises 2).

*U.S. Customs and Border Protection Seizures of Counterfeit Merchandise*

19.     As detailed below, between approximately June 2017, and January 2025, CBP has seized approximately 18 shipments containing counterfeit merchandise destined for AHMAD ABULAWI (including his aliases such as "Adam Abu"), DUTTI FASHION, and/or JORDAN RIVER FASHION. The MSRP for the 18 shipments of seized counterfeit merchandise exceeds $1.6 million. It should be noted that the below seizures were not targeted inspections based on this investigation.

20.     **Seizure 2017SZ008546401** On or about June 8, 2017, a shipment originating from Hong Kong destined for GABRIELA FEGHIU at XXXX S. 28th Street, Franklin, WI 53132 was seized by CBP. The shipment was manifested as SHOES 36PCS with a declared value of $48.00. Upon examination, it was discovered the package contained 12 Louis Vuitton wallets, 2 Louis Vuitton belts, 2 Louis Vuitton handbags, 6 GUCCI wallets, and 2 GUCCI belts. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$16,220** for the seized merchandise.

21.     **Seizure 2019SZ0098920** On or about July 10, 2019, a shipment originating from Hong Kong and destined for Premises 1 was seized by CBP. The shipment was manifested as

6

SKIRT with a declared value of $126.00. Upon examination, 60 Louis Vuitton wallets, 30 Louis Vuitton Hats, and 30 Gucci hats were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$34,970** for the seized merchandise.

22. **Seizure 2019SZ0098979** On or about July 10, 2019, a shipment originating from Hong Kong and destined for Premises 1 was seized by CBP. The shipment was manifested as DRESS with a declared value of $138.00. Upon examination, 40 Louis Vuitton wallets, 30 Louis Vuitton Hats, and 30 Gucci hats were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$31,670** for the seized merchandise.

23. **Seizure 2020SZ0079027** On or about April 13, 2020, a shipment originating from Hong Kong destined for AHMAD ABULAWI at Premises 1 was seized by CBP. This shipment was manifested as Children's Box with a declared value of $30. Upon examination, 36 Rolex Oyster Perpetual watches of various types were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$966,800** for the seized merchandise.

24. **Seizure 2020SZ0084447** On or about April 29, 2020, a shipment originating from Turkey destined for Monix Abu at 628 W. Historic Mitchell Street, Milwaukee, WI 53204 (LE DUTTI FASHION) was seized by CBP. The shipment was manifested as T-SHIRT SAMPLE SWEATSHIRT SAMPLE JEANS SAMPLE. Examination of the shipment revealed designer clothing, handbags and sneakers. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$20,445** for the seized merchandise.

25. **Seizure 2020SZ0089500** On or about May 14, 2020, a shipment originating from Hong Kong destined for AHMAD ABULAWI at Premises 1 was seized by CBP. The shipment was manifested as PLASTIC PACKING BOX with no declared value. Upon examination, it was

7

discovered the package contained 18 packaged CARTIER Sunglasses. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$17,010** for the seized merchandise.

26. **Seizure 2020SZ0090964** On or about May 19, 2020, a shipment originating from Turkey destined for Niko Abu at Premises 1 was seized by CBP. This shipment was manifested as SHOES SAMPLE T-SHIRT JEANS SAMPLE HAT SAMPLE. Upon examination, the shipment was found to contain 1 pair of Dior shoes, 3 pairs of Dolce & Gabbana shoes, 4 pairs of Chanel shoes, 6 Versace sweatsuits, 5 Louis Vuitton sweatsuits, 3 Dolce & Gabbana polo shirts, and 5 Moncler polo shirts. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$36,605** for the seized merchandise.

27. **Seizure 2020SZ0098434** On or about June 11, 2020, a shipment originating from Turkey and destined for Niko Abu at Premises 1 was seized by CBP. Upon examination, 10 Amiri t-shirts, 5 Moschino t-shirts, 24 Fendi hats, 3 Dolce & Gabbana polo shirts, 5 Moncler t-shirts, 20 Balenciaga t-shirts, 5 Kenzo t-shirts, 5 Gucci t-shirts, 5 Givenchy t-shirts, 3 Christian Dior sweatshirts, 3 pair of Christian Dior sweatpants, 5 Louis Vuitton t-shirts, 5 Fendi t-shirts, 5 Off White Brand t-shirts, 18 Balenciaga hats, and 12 Valentino hats were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$57,071** for the seized merchandise.

28. **Seizure 2020SZ0107518** On or about July 6, 2020, a shipment originating from Turkey destined for Adam Abu at Premises 1 was seized. The shipment was manifested as CAP ET AL CAPRI SUIT TSHIRT CAP SLIPPER. Upon examination, 10 Moncler shirts, 6 Gucci polo shirts, 6 Fendi polo shirts, 7 Moncler jackets, 7 Moncler pants, 8 pairs D Squared jeans, 4 pairs Chanel shoes, 2 pairs Dolce and Gabbana shoes, 2 pairs Dior shoes, 5 pairs Versace shoes, 4 Louis

8

Vuitton purses, 5 Balenciaga sweatshirts, 8 Fendi sweatshirts, 5 Givenchy hoodies, 9 Versace long shirts, 4 Dior sweatshirts and 6 Chanel sweatshirts were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$72,275** for the seized merchandise.

29.     **Seizure 2020SZ0107530** On or about July 6, 2020, a shipment originating from Turkey destined for Adam Abu at XXXX S. Scepter Drive, #XX, Franklin, WI 53132. According to law enforcement databases, this address is associated with AHMAD ABULAWI. This shipment was seized by CBP. The shipment was manifested as 15 PCS BELT 20 PCS SHOES SAMPLE. Upon examination, CBP found 12 Gucci belts, 16 pairs Dolce and Gabbana shoes, 10 Dior belts, 12 Hermes belts, 7 pairs Dior shoes, 2 pairs Versace shoes, 11 pairs Louis Vuitton shoes, 12 Fendi belts, 9 pairs Balenciaga shoes and 12 Chanel belts. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$84,715** for the seized merchandise.

30.     **Seizure 2020SZ0108096** On or about July 7, 2020, a shipment originating from Turkey destined for Adam Abu at XXXX S. Scepter Drive #XX, Franklin, WI  53132 was seized by CBP. The shipment was manifested as 45 PCS KIDS CLOTHING SAMPLE. Upon examination, 10 Moncler shirts, 3 pairs Dolce and Gabbana shoes, 7 pairs Fendi shoes, 17 pairs Christian Louboutin shoes, 6 pairs Dior shoes, 4 pairs Versace shoes, 1 pair Louis Vuitton shoes, 20 Louis Vuitton belts, 6 pairs Balenciaga shoes and 24 Balenciaga belts were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$64,085** for the seized merchandise.

31.     **Seizure 2020SZ0124763** On or about August 13, 2020, a shipment originating from Turkey and destined to Niko Abu at 628 W. Historic Mitchell Street, Milwaukee, WI 53204

9

(LE DUTTI FASHION) was seized by CBP. The shipment was manifested as TEXTILE GOODS. Upon examination, 36 Fendi/Off White Label belts, 48 Chanel/Moshino/Dior belts, 4 (ea) Versace/Dior/Balenciaga Shoes, and 5 pairs of Dolce & Gabbana shoes were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$54,980** for the seized merchandise.

32. **Seizure 2020SZ0142495** On or about September 22, 2020, a shipment originating from Turkey destined for Haith Nijem at XXXX S. 28th Street, Franklin, WI 53132 was seized by CBP. The shipment was manifested as COTTON DRESS SHOES. Upon examination, 22 pairs of Gucci shoes, 6 pairs of Louis Vuitton shoes, 9 pairs of Philipp Plein shoes, and 9 pairs of Versace shoes were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$39,405** for the seized merchandise.

33. **Seizure 2020SZ0142527** On or about September 22, 2020, a shipment originating from Turkey destined for HAITH NIJEM at XXXX S. 28th Street, Franklin, WI 53132 was seized by CBP. The shipment was manifested as COTTON DRESS SHOES with a value of $265.00. Upon examination, 2 pair of Gucci shoes, 9 pair of Louis Vuitton shoes, 2 pair of Gucci shoes, 8 pair of Balenciaga shoes, 3 pair of Philipp Plein shoes, 22 pair of Versace Shoes, and 1 Gucci handbag were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$33,500** for the seized merchandise.

34. **Seizure 2021SZ0006500** On or about October 20, 2020, a shipment originating from Hong Kong destined for Adam Abu at XXXX S. Ventana Drive, Oak Creek, WI 53154 was seized by CBP. The shipment was manifested as LADY SHOES SAMPLE. Upon examination, 8 pairs of Dolce & Gabbana sneakers, 16 pairs of Gucci sneakers with and w/o straps, and 8 pairs of Moncler sneakers were found. The merchandise was determined to be counterfeit and was seized.

10

The MSRP value was determined to be **$25,830** for the seized merchandise.

35.     **Seizure 2021SZ0006489** On or about October 20, 2020, a shipment originating from Hong Kong destined for Adam Abu at XXXX S. Ventana Drive, Oak Creek, WI 53154 was seized by CBP. The shipment was manifested as MEN SHOES SAMPLE. Upon examination, 8 pairs of Dolce & Gabbana shoes, 16 pairs of Gucci shoes, and 12 pairs of Balenciaga shoes were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$29,980** for the seized merchandise.

36.     **Seizure 2021SZ0031977** On or about December 29, 2020, a shipment originating from Hong Kong destined for Mon Abu at Premises 1 was seized by CBP. The shipment was manifested as PACKAGING BOX with no declared value. Upon examination, 24 packaged CARTIER Sunglasses were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$19,080** for the seized merchandise.

37.     **Seizure 2025SZ0030197** On or about January 15, 2025, a shipment originating from Egypt destined for JORDAN RIVER FASHION at Premises 2 was seized by CBP. The shipment was manifested as T-SHIRT SAMPLES with a declared value of $35.00. Upon examination, 7 Louis Vuitton Jackets, 5 Fendi Jackets, 5 Fendi Pants, 9 Prada Jackets, 5 Prada Pants, 4 Balenciaga Sweaters, 4 Balenciaga Jackets, 4 Dior Sweaters, 8 Dolce and Gabbana Sweaters, 4 Gucci Sweaters and 6 Dolce and Gabbana Pants were found. The merchandise was determined to be counterfeit and was seized. The MSRP value was determined to be **$85,169.97** for the seized merchandise.

*Edward R. Kirby and Associates Undercover Purchase on March 23, 2022*

38.     On or about March 23, 2022, Kirby Investigator entered DUTTI FASHION (Premises 1) and observed a Middle Eastern male employee working inside the store. The Kirby

11

Investigator also observed numerous Louis Vuitton, Gucci, Fendi, and Nike merchandise available for purchase. The Kirby Investigator inquired with the employee regarding a small, brown Louis Vuitton backpack. The employee stated that this item was $100.00. After continued conversation, the employee agreed to accept $85.00 for the backpack. The Kirby Investigator purchased this item using a credit card and was issued a receipt which identified the store as DUTTI FASHION, 620 W. Historic Mitchell Street, Milwaukee, WI 53204. This bag was later inspected and identified as counterfeit.

*Edward R. Kirby & Associates, Inc. Operation on October 18, 2022*

39.    On or about October 18, 2022, Investigators from Kirby, with the assistance of HSI Milwaukee Special Agents, conducted an overt operation at the business locations of DUTTI FASHION and LE DUTTI FASHION in an attempt to identify and seize the counterfeit merchandise sold at the businesses.

40.    That same day, Kirby Investigators and HSI Milwaukee Special Agents entered Premises 1 and were greeted by a female employee. Kirby Investigators and HSI Milwaukee Special Agents stated the purpose of the visit, after which point the employee contacted the owner, AHMAD ABULAWI, via telephone. AHMAD ABULAWI indicated that an employee, NIMER ASAD, would travel to Premises 1 and meet the HSI Special Agents and Kirby Investigators.

41.    On this same date, NIMER ASAD arrived at Premises 1. HSI Special Agents spoke with NIMER ASAD and AHMAD ABULAWI (by telephone) regarding the counterfeit merchandise, after which the counterfeit merchandise was voluntarily surrendered to Kirby Investigators. NIMER ASAD voluntarily signed a receipt on behalf of AHMAD ABULAWI that was provided by Kirby Investigators acknowledging the surrender of the below listed counterfeit merchandise from DUTTI FASHION and LE DUTTI FASHION.

12

350 items depicting the counterfeit trademarks of Louis Vuitton
403 items depicting the counterfeit trademarks of Gucci
223 items depicting the counterfeit trademarks of Christian Dior
105 items depicting the counterfeit trademarks of Versace
91 items depicting the counterfeit trademarks of Burberry
46 items depicting the counterfeit trademarks of Chanel
11 items depicting the counterfeit trademarks of Rolex
14 items depicting the counterfeit trademarks of Celine
7 items depicting the counterfeit trademarks of Michael Kors
1 item depicting the counterfeit trademarks of Jimmy Cho

42.     As part of the operation, Kirby Investigators photographed some of the merchandise sold at the businesses, seen below.

 

*Edward R. Kirby & Associates, Inc. Undercover Purchase on October 28, 2023*

43.     On or about October 28, 2023, a Kirby Investigator traveled to DUTTI FASHION, (Premises 1). The Kirby Investigator entered the location, canvassed the store, and observed numerous counterfeit items on display and available for purchase. The Kirby Investigator noted that there were significant quantities of Louis Vuitton and Gucci items, along with a smaller amount of Burberry, Fendi, and Cartier items.

44.     The Kirby Investigator observed one Chanel hat hanging on display rack and inquired with an employee as to the availability of additional Chanel product. The employees stated that they did not have additional Chanel merchandise and did not provide information if they would

13

receive new inventory of Chanel product. The Kirby Investigator purchased the black Chanel hat for $60.[1] The Kirby Investigator was issued a receipt which identified the store as DUTTI FASHION, 620 W. Historic Mitchell Street, Milwaukee, WI 53204. As part of the undercover purchase, the Kirby Investigator took photographs of some of the merchandise available for sale, including the purchased Chanel hat, at DUTTI FASHION, seen below.

 

45.     While at DUTTI FASHION, the Kirby Investigator spoke with the employee and asked if they still operated their second store (LE DUTTI FASHION). The employee stated that the second store was no longer open. The Kirby Investigator walked to the LE DUTTI FASHION store location and confirmed that the store was vacant.

46.     On or about January 10, 2024, Kevin Read contacted HSI Milwaukee Special Agents informing that DUTTI FASHION was again selling counterfeit merchandise.

---

[1] Genuine Chanel baseball-style hats often retail for over $200 or more. *See, e.g.,* *https://www.chanel.com/us/fashion/p/AAA954B20209U0210/cap-mixed-fibers/ and* *https://reluxshop.com/collections/chanel-hats?srsltid=AfmBOopiWMeOaLGKcggCbU11waLCdwyMuVUHNp-iiPEzfGpYzpHiohUk*

14

*January 29, 2024 Surveillance at DUTTI FASHION*

47.    On or about January 29, 2024, HSI Special Agent conducted surveillance at Premises 1. At approximately 10:38am that same day, the HSI Special Agent observed a gray Jeep Grand Cherokee, bearing Wisconsin license plate ATV2355, park in front of Premises 1. The HSI Special Agent observed AHMAD ABULAWI exit the vehicle, enter Premises 1, and prepare the store for opening.

48.    A search of Law Enforcement databases at that time showed that the vehicle was registered to AHMAD ABULAWI with an address of XXXX S. Ventana Drive, Unit XXXX, Oak Creek, WI 53154 (this is the address associated with some of the shipments containing counterfeit merchandise seized by CBP).

*February 29, 2024 Surveillance at DUTTI FASHION*

49.    On or about February 29, 2024, HSI Special Agent conducted surveillance at Premises 1. Upon establishing surveillance, the HSI Special Agent observed a white Jeep Grand Cherokee, bearing Wisconsin license plate ACY5691, parked in front of Premises 1. At approximately 11:00am that same day, the HSI Special Agent observed AHMAD ABULAWI enter the vehicle and leave the area.

50.    A search of Law Enforcement databases at that time showed that the vehicle was registered to TABSEEM AZMI FROUKH with an address of XXXX S. Ventana Drive, Unit XXXX, Oak Creek, WI 53154 (this is believed to be the wife of AHMAD ABULAWI).

*PNC Bank Records* Review

51.    In June 2024, HSI Special Agents received PNC Bank records in response to a subpoena for an account belonging to DUTTI FASHION, account number ending in 3761. The records listed the account as a Business Checking account with address 620 W. Historic Mitchell

15

Street, Milwaukee, WI 53204 (Premises 1), and listed AHMAD ABULAWI as the member. The provided records included statements for the time period of approximately December 5, 2023, through June 12, 2024. A review of the total activity for the same time period showed that there were approximately **$420,625.21** in Deposits, including approximately **$131,028.43** in cash deposits.

52.     The records revealed that there were numerous Zelle transfers to and from a Zelle account associated with JORDAN RIVER FASHION, as well as one Zelle transaction from a Zelle account associated with BAHADDIN ABULAWI. Zelle is a service that allows users to send and receive money electronically between bank accounts in the United States. The Zelle service enables individuals to electronically transfer money from their bank account to another registered user's bank account using a mobile device or the website of a participating banking institution. Most of the transactions indicated that AHMAD ABULAWI was sending money to Jordan River Fashion, LLC. The amount of transfers ranged from $100 up to $1,000.

*TriCity National Bank Review*

53.     In July 2024, HSI Special Agents received TriCity National Bank records in response to a Grand Jury Subpoena for accounts belonging to AHMAD ABULAWI and DUTTI FASHION. The records showed that an account belonging to AHMAD ABULAWI and TABSEEM FROUKH, TriCity National Bank account number ending in 8981, received multiple Zelle payments from accounts associated with JORDAN RIVER FASHION and BAHADDIN ABULAWI, as detailed below.

| Date | Activity Detail | Amount | Description |
|------|-----------------|--------|-------------|
| 11/02/23 | Deposits | $200.00 | ACCOUNT CREDIT ZELLE JORDAN RIVER FASHI TRI CITY NATIONAL 83582 6400 S 27TH ST |

16

| 11/24/23 | Deposits | $700.00 | ACCOUNT CREDIT ZELLE JORDAN RIVER FASHI TRI CITY NATIONAL 83582 6400 S 27TH ST |
|---|---|---|---|
| 11/27/23 | Deposits | $3,200.00 | ACCOUNT CREDIT ZELLE JORDAN RIVER FASHI TRI CITY NATIONAL 83582 6400 S 27TH ST |
| 11/27/23 | Deposits | $240.00 | ACCOUNT CREDIT ZELLE JORDAN RIVER FASHI TRI CITY NATIONAL 83582 6400 S 27TH ST |
| 12/04/23 | Deposits | $300.00 | ACCOUNT CREDIT ZELLE BAHADDIN Y ABU-LAW TRI CITY NATIONAL 83582 6400 S 27TH ST |
| 12/04/23 | Deposits | $275.00 | ACCOUNT CREDIT ZELLE BAHADDIN Y ABU-LAW TRI CITY NATIONAL 83582 6400 S 27TH ST |

54.     The TriCity National Bank records also showed that an account belonging to DUTTI FASHION at 620 W. Historic Mitchell Street, Milwaukee, WI 53204 (Premises 1), account ending in 0343, had multiple checks written to Bahaa Abulawi (this is believed to be BAHADDIN ABULAWI), as seen below.



*HSI Undercover Purchase at DUTTI FASHION*

55.     On or about August 13, 2024, HSI Special Agents acting in an undercover (UC) capacity conducted an undercover purchase of suspected counterfeit merchandise at Premises 1. Upon arriving at Premises 1, the UC Agents observed AHMAD ABULAWI exit the driver's side of a white Jeep Grand Cherokee, bearing Wisconsin license plate ACY5691, and immediately open the back passenger door. AHMAD ABULAWI was observed as he removed several Nike branded shoe boxes from his vehicle. Moments later, the UC Agents observed AHMAD ABULAWI give the Nike shoe boxes to an unidentified teenaged male subject (hereinafter referred to as M/1).

17

56.     UC Agents exited their vehicle and attempted to enter Premises 1. The UC Agents encountered a locked, wrought iron door which led into the interior of the business. The door had a note affixed to it which directed customers to request assistance from the tobacco shop next door. A UC Agent entered the tobacco shop where he/she encountered M/1. The UC Agent told the subjects that he/she needed assistance next door. M/1 then exited the tobacco shop, entered Premises 1 and unlocked the wrought iron door.

57.     Upon entering the location, the UC Agents encountered a large table displaying various shoe brands, to include Nike, Gucci, Louis Vuitton, Balenciaga and Dolce and Gabbana. After several minutes, the UC Agents began inquiring about the different shoes and the sizes available for purchase. M/1 helped the UC Agents by bringing out various shoes sizes and other merchandise that was not on display within the store. The UC Agents determined that most shoes were priced between $90 and $120, far below what genuine shoes bearing these luxury trademarks retail for. On display within the store were also hats, Louis Vuitton branded purses, Gucci-branded back packs and purses, Gucci-branded belts, and other accessories.

58.     A UC Agent located a display case containing several luxury brand watches. A UC Agent identified a Rolex branded watch displayed in a green Rolex box. The UC Agent asked M/1 if the watch was a replica. M/1 stated that the watch was "not real, but they're lookalikes that look real." The UC Agents determined that the replica Rolex watch was priced at $130.[2] Other items on display in the store included various luxury branded belts.

59.     During the undercover purchase, the UC Agents compiled the following items for purchase: three pairs of Nike athletic shoes, one pair of Gucci athletic shoes, one pair of Dolce and

---

[2] The price range of new, genuine Rolex watches begins around $5,500 and can go upwards of $75,000. *See https://www.bobswatches.com/rolex/how-much-is-a-rolex?srsltid=AfmBOooLXN4KMuXB2MZ4ZI9ZVjXh6rj-FKEB4MYjCZWKA8vHsW3UP77N*

Gabbana athletic shoes, one pair of Louis Vuitton/Nike compilation athletic shoes, one Burberry purse, two Gucci belts, three Louis Vuitton purses, one Prada hat, a Rolex watch and bracelet, and a bottle of Aventus Creed branded cologne. The UC Agents asked M/1 for the price of their total purchase. Moments later, M/1 sent what appeared to be a text message to an unknown recipient and advised the UC Agents that he was not the owner of the business. M/1 stated that his uncle was going to come and determine the total cost for their purchase.

60.     Several moments later, AHMAD ABULAWI entered Premises 1 and greeted the UC Agents. After determining the total cost of the items complied by the UC Agents, AHMAD ABULAWI advised the UC Agents that the total purchase was $2,260. A UC Agent asked AHMAD ABULAWI if they'd receive a discount if they paid in cash. AHMAD ABULAWI agreed, and the UC Agent countered by offering AHMAD ABULAWI $2,000 for the total purchase. AHMAD ABULAWI agreed and was given $2,000. AHMAD ABULAWI did not provide UC Agents a receipt or any proof of purchase.

61.     A UC Agent advised AHMAD ABULAWI that he/she threw purse parties and was looking for high-end purses. UC Agent showed AHMAD ABULAWI photos of the high-end purses of interest. AHMAD ABULAWI stated that he could find those and could purchase them via a special order. AHMAD ABULAWI then provided the UC Agent with his direct phone number: 414-737-5380. Upon completion of the purchase, M/1 helped the UC Agents take their purchases to their undercover vehicle. During conversation with M/1, the UC Agents determined that he was AHMAD ABULAWI's sixteen-year-old nephew.

62.     An online search of the phone number 414-737-5380 (via Google.com) showed that the phone number was listed as the contact phone number for a Facebook page associated with the name "Dutti fashion exclusive line", URL "https://www.facebook.com/p/Dutti-fashion-exclusive-

19

line-100040197234954/." This is the same phone number provided to the Wisconsin Department of Financial Institutions as the contact phone number for AHMAD ABULAWI. The Facebook appeared to have video and picture posts of merchandise similar to the counterfeit merchandise previously observed at DUTTI FASHION.

63. That same day, the purchased merchandise was transported to the HSI Milwaukee office. HSI Special Agents photographed the suspected counterfeit merchandise purchased by the UC Agents, pictured below, and noted that some of the merchandise was similar to the counterfeit merchandise previously observed at DUTTI FASHION. Furthermore, some of the merchandise had what appeared to be receipts, indicating that the merchandise was purchased in Hong Kong. In my training and experience, Hong Kong is a significant source of counterfeit consumer goods.



*Edward R. Kirby & Associates, Inc. Inspection of Purchased Merchandise*

64. On or about August 16, 2024, an HSI Special Agent met with Kevin Read at the HSI Milwaukee office to inspect the merchandise purchased during the Undercover purchase on August 13, 2024. As detailed below, Kevin Read identified that many of the purchased items were

20

counterfeit.

65.     Kevin Read specifically identified three different Louis Vuitton handbags as counterfeit based on plastic wrap around the handles of the items, hangtags which were not consistent with Louis Vuitton product, stitching on the items that was not consistent with Louis Vuitton and the items were crafted with materials that were not used by Louis Vuitton. Kevin Read inspected three pairs of Nike gym shoes along with a fourth pair of shoes which bore the trademarks of Louis Vuitton and Nike. Kevin Read identified each of these items as counterfeit based on incorrect labels, poor quality and stitching, as well as poor craftmanship. Kevin Read inspected a pair of Gucci gym shoes and two belts, which were counterfeit based on poor stitching and quality as well as improper labeling. Kevin Read inspected a counterfeit Rolex watch which was counterfeit based on a poor and improper magnifier, tape around clasp, and poor craftmanship. Kevin Read inspected a Prada hat which was counterfeit based on poor craftmanship and improper labeling.

*January 27, 2025 Surveillance of JORDAN RIVER FASHION (Premises 2)*

66.     On or about January 27, 2025, HSI Special Agents conducted surveillance of Premises 2. Upon arrival, HSI Special Agents observed the store open for business. HSI Special Agents noted a silver Mitsubishi Outlander vehicle, bearing Wisconsin license plate VH9615, parked in front of Premises 2.

67.     A search of Law Enforcement databases at that time showed that the vehicle was registered to HEYAM ABULAWI at Premises 4 (this is believed to be the wife of BAHADDIN ABULAWI).

*January 31, 2025 Surveillance of BAHADDIN ABULAWI*

68.     On or about January 31, 2025, I established surveillance at the residence of

21

BAHADDIN ABULAWI at Premises 4. At approximately 11:04am that same day, I observed a silver Mitsubishi vehicle, bearing Wisconsin license plate VH9615, exit the parking area. I observed a male and female individuals inside the vehicle. I followed the vehicle as it travelled to the area of Premises 2. The vehicle was then observed parking on the street curb next to the front entrance of Premises 2. An HSI Special Agent identified BAHADDIN ABULAWI as he exited the vehicle and entered the store. The HSI Special Agent identified the female as HEYAM ABULAWI.

*February 14, 2025 Surveillance at DUTTI FASHION (Premises 1)*

69.     On or about February 14, 2025, HSI Special Agents conducted surveillance at the location of Premises 1. As part of the surveillance, an HSI Special Agent entered Premises 1 and noted the store to be in similar condition and selling similar merchandise as observed during the undercover purchase conducted in August 2024. The HSI Special Agent spoke with an unidentified male sitting behind the display counter. The male stated that he was the co-owner of DUTTI FASHION with the previous owner (this is believed to be AHMAD ABULAWI) still partnering with him. The male stated he typically is the one running the store, but the ordering of new items happens through the other co-owner (this is believed to be AHMAD ABULAWI).[3]

*February 14, 2025 Surveillance at JORDAN RIVER FASHION (Premises 2)*

70.     On or about February 14, 2025, HSI Special Agents conducted surveillance at Premises 2. As part of the surveillance, an HSI Special Agent entered Premises 2 and noted the store sold merchandise similar in style to Premises 1, which included Jordan Brand, Dulce & Gabbana, Prada, and other high end luxury brands of goods for sale. The HSI Special Agent observed BAHADDIN ABULAWI and HEYAM ABULAWI sitting in the back-office area of the

---

[3] It is possible that Abulawi orders merchandise from locations other than Premises 1 including from his residence.

store.

*Open Source Checks (Facebook)*

71.    On or about February 14, 2025, Open-source checks identified AHMAD ABULAWI's Facebook page under the username "Ahmad Yousef (Dutti fashion exclusive line)" and the URL www.facebook.com/ahmad.abulawi.739. Under AHMAD ABULAWI's "intro" section, it stated AHMAD ABULAWI is the "Owner & Designer at Dutti exclusive fashion". Upon clicking on this link to his "Dutti exclusive fashion" page, it provided a Facebook page, URL www.facebook.com/profile.php?id+100063530112413. On this page, videos of the inventory in the store could be seen last dated February 23, 2022. The page also provided address of 620 W. Historic Mitchell Street, Milwaukee, WI 53204 (Premises 1) and phone number 414-737-5380. This phone number matches the phone number AHMAD ABULAWI gave to the undercovers (UC) during the UC purchase at DUTTI FASHION.

72.    Open-source checks also identified BAHADDIN ABULAWI with the Facebook page username Bahaa Abulawi, URL www.facebook.com/bahaa.abulawi. This page was last posted in April of 2021 and has Ahmad Yousef (AHMAD ABULAWI) listed as a friend. BAHADDIN ABULAWI's page is also following the "Dutti fashion exclusive line" and "Dutti exclusive fashion" Facebook pages mentioned above. Another page associated with BAHADDIN ABULAWI is the Facebook page with the username Bahaa Abulawi, URL www.facebook.com/bahaa.abulawi.1. This page is following "Dutti fashion exclusive line" and "Jordan River fashion", URL www.facebook.com/jordanriverfashion.

73.    The Jordan River fashion Facebook page lists an address of 3429 W. North Avenue, Milwaukee, WI 53208 (Premises 2) with a phone number of 414-526-8654. The Facebook appeared to have video and picture posts of merchandise similar to the counterfeit merchandise

23

Case 2:25-mj-00910-NJ    Filed 05/16/25    Page 30 of 49    Document 1

previously observed at DUTTI FASHION, with a last post date of January 9, 2025. This page is followed by Ahmad Yousef (AHMAD ABULAWI).



*Google Reviews for DUTTI FASHION*

74.     On February 19, 2025, I conducted a Google search of DUTTI FASHION and noted multiple reviews/ratings left for DUTTI FASHION. At the time of this affidavit (May 12, 2025), the Google listing for DUTTI FASHION showed 26 Google reviews listed with a rating of 4.2 stars out of 5. Some of the reviews appeared to list that DUTTI FASHION was selling counterfeit merchandise, as shown below.



*Surveillance at Premises 3 on 3/11/2025*

75.     On or about March 11, 2025, at approximately 6:30am, surveillance was established at the residence of AHMAD ABULAWI, 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3). HSI Special Agents noted a white Jeep Grand Cherokee, bearing Wisconsin license plate ACY5691, parked in the driveway of Premises 4. This is the same vehicle observed during the undercover purchase on or about August 13, 2024.

76.     At approximately 10:37am that same day, I observed AHMAD ABULAWI exit Premises 3 through the front door and enter the Jeep vehicle. I followed the vehicle as it traveled to the parking lot of Mochinut Donut, 4848 S. 76th Street, Greenfield, WI 53220. The investigation has shown that AHMAD ABULAWI was believed to be the owner of Mochinut Donut.

*Trash Pull at Premises 3 on March 18, 2025*

77.     On or about March 18, 2025, at approximately 5:15am, surveillance was established at the residence of AHMAD ABULAWI, 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3). HSI Special Agents noted that the trash bins were set at the end of the driveway, next to the curb of the street. At approximately 7:30am that same day, with the assistance of John's Disposal, HSI Special Agents collected the trash from Premises 3. Below are some of the items retrieved:

-   2 empty Nike Air Jordan shoe boxes

-   empty Versace box

-   empty pill bottle with label - prescribed to AHMAD ABULAWI, 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3)

-   USPS Ground Advantage label addressed to FARAH ABULAWI, 5588 S. 27th Street Milwaukee, WI 53221 (This is the address for Premises 4)

*Trash Pull at Premises 4 on March 21, 2025*

78.     On or about March 21, 2025, at approximately 10:55am, I conducted drive-by surveillance of the residence of BAHADDIN ABULAWI, 5588 S. 27th Street, Milwaukee, WI 53221 (Premises 4) and noted that the recycling trash bin was set at the end of the driveway, next to the curb of the street. I set up surveillance across the street from the residence.

79.     At approximately 11:15am that same day, I met with another HSI Special Agent and collected the trash from Premises 4. Below are some of the items retrieved:

-   Four receipts that appeared to be cash register printouts for the total transactions for the day. Each of the receipts had listed JORDAN RIVER FASHION at the top with an address 3429 W. North Avenue, Milwaukee, WI 53208 (Premises 2), and phone number 414-526-8654. Each of the receipts also listed "BAHADDI ABULAWI" and "EMPLOYEE" for the breakdown of the transactions along with a dollar value. The receipts were as follows:

    o   6 transactions $1,930.00 February 28, 2025

    o   2 transactions $280.00 March 8, 2025

    o   4 transactions $870.00 March 10, 2025

    o   6 transactions $770.00

-   Three receipts for Community Financial Service Center (CFSC) at 4535 W. North Avenue, Milwaukee, WI 53208

    o   February 25, 2025 - Cash Check $900.00

    o   February 25, 2025 - Money Order $1,400.00, remitter JORDAN RIVER FASHION

    o   March 12, 2025 - Money Orders $720.00 and $600.00, remitter JORDAN RIVER FASHION

-   Three receipts/copies of what appeared to be money orders issued by CFSC

26

- o August 13, 2024, $1,168.75 from HEYAM ABULAWI, NO. A16069263

- o August 13, 2024, $401.53 from Rakan Abulawi, NO. A16069262

- o February 25, 2025, $1,400.00 from JORDAN RIVER FASHION, NO. A16076919

*Trash Pull at Premises 4 on April 21, 2025*

80.    On or about April 21, 2025, at approximately 9:20am, surveillance was established at the residence of BAHADDIN ABULAWI at Premises 4. Shortly after establishing surveillance, I drove by the residence and noted that the recycling trash bin was set at the end of the driveway of Premises 4, next to the curb of the street. I also noted that there were three vehicles parked in the driveway, with a silver Mitsubishi vehicle, bearing Wisconsin license plate VH9615, parked closest to the street.

81.    At approximately 9:55am that same day, an individual closely resembling BAHADDIN ABULAWI was observed exiting the residence and entering the Mitsubishi vehicle. Shortly after, the vehicle was observed leaving the residence and travelling north on S. 27th Street.

82.    At approximately 9:57am that same day, I and another HSI Special Agent collected the recycling trash from the recycling bin. Below are some of the items retrieved:

-    Four receipts/copies of what appeared to be money orders issued by Community Financial Service Center Corp. (CFSC):

    - o January 31, 2025, $2,160.00 from Jordan River Fashion, NO. A09062356, pay to Cas 103 50th Street, Brooklyn, NY 11232

    - o February 3, 2025, $700.00 from Jordan Rivers Fashion, NO. A09062552

    - o February 3, 2025, $900.00 from Jordan Rivers Fashion, NO. A09062554

    - o February 21, 2025, $1,500.00 from Jordan River Fashion, NO. A16076820

27

- One receipt that appeared to be cash register printout for the total transactions for the day. The receipt listed JORDAN RIVER FASHION at the top with an address 3429 W. North Avenue, Milwaukee, WI 53208 (Premises 2), and phone number 414-526-8654. The receipt listed "BAHADDI ABULAWI" for the breakdown of the transactions along with a dollar value. The receipt had the following information.

- Five We-Energies letters addressed to JORDAN RIVER FASHION LLC, 3429 W. North Avenue, Milwaukee, WI 53208 (Premises 2)

*Old National Bank Account for DUTTI FASHION*

83.     In May 2025, I received records from Old National Bank in response to a subpoena for an account belonging to DUTTI FASHION, account number ending in 5226. The account's bank statements listed 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3) as the address for DUTTI FASHION. It should also be noted that the physical address for the account was listed as 620 W. Historic Mitchell St., Milwaukee, WI 53204 (Premises 1).

84.     The account records also showed that AHMAD ABULAWI was listed as the beneficial owner of the business/account, with the title of Manager. The address for AHMAD ABULAWI was also listed as 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3).

## TECHNICAL TERMS

85.     Based on my training and experience, I use the following technical terms to convey the following meanings:

- IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic

28

sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

• Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

• Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

86.     As described above and in Attachment B, this application seeks permission to search for records that might be found at Premises 1, 2, 3, & 4 (each and together, the "SUBJECT PREMISES"), in whatever form they are found. One form in which the records might be found is data stored on a computer or cell phone's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

87.     *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found at the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

• Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto

29

a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

- Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

- Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

- Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

88. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers

30

were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the SUBJECT PREMISES because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

- As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of

31

occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping"

32

program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

• A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

• The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

• Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

• I know that when an individual uses a computer or cellular phone to sell counterfeit goods through an e-commerce website, the individual's computer or cellular phone will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer or cellular phone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer or cellular phone is also likely to be a storage medium for evidence of crime.

33

From my training and experience, I believe that a computer or cellular phone used to commit a crime of this type may contain: data that is evidence of how the computer or cellular phone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

89.     *Necessity of seizing or copying entire computers, cellular phones, or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media, a computer, or a cellular phone often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media, computer, or cellular phone, from the premises, it is sometimes possible to make an image copy of storage media, computer, or cellular phone. Generally speaking, imaging is the taking of a complete electronic picture of the computer, cellular phone, or storge media's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, computer, or cellular phone, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

•     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer, storage media, or cellular phone has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media, cellular phone, or computer to obtain evidence. Storage media, cellular phones, or computers can store a large volume of information. Reviewing that information for things

34

described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

• Technical requirements. Computers and cellular phones can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

• Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media, computer, and cellular phone formats that may require off-site reviewing with specialized forensic tools.

90.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media, computers, and cellular phones that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of them consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

91.    The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris

35

characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

92.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

93.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

94.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

95. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

96. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

97. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

98. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law

37

enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

99.     Due to the foregoing, with respect to any person who is located in the SUBJECT PREMISES during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant,  it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## EXPERT ASSISTANCE

100.     Based on their unique expertise, HSI intends to utilize the assistance of personnel from Kirby to assist in the identification of counterfeit merchandise/property at the SUBJECT PREMISES, but only after law enforcement agents enter and secure each location and serve the warrants. This will allow agents to more efficiently identify counterfeit items for seizure and will help agents avoid seizing non-counterfeit items. Personnel from Kirby will not seize items or perform any actions other than to advise law enforcement agents on which items may be counterfeit.

## CONCLUSION

101.      I submit that this affidavit supports probable cause for a warrant to search the DUTTI FASHION, the business located at 620 W. Historic Mitchell Street, Milwaukee, WI 53204 (Premises 1); JORDAN RIVER FASHION, the business located at 3429 W. North Avenue, Milwaukee, WI 53208 (Premises 2); the residence located at 3937 W. Heatheridge Drive, Franklin, WI 53132 (Premises 3); and the residence located at 5588 S. 27th Street, Milwaukee, WI 53221 (Premises 4), described in Attachment A, and seize the items described in Attachment B.

## **ATTACHMENT A**

### *Property to Be Searched*

The property to be searched is **DUTTI FASHION**, located at **620 W. Historic Mitchell Street, Milwaukee, WI 53204** (PREMISES 1 or "Subject Premises"), to include the mailbox and all associated storage lockers, closets, and areas associated with PREMISES 1 located within the curtilage of the Subject Premises including Jeep vehicles bearing Wisconsin license plate ATV2355 and Wisconsin license plate ACY5691.

The property of **DUTTI FASHION**, **620 W. Historic Mitchell Street, Milwaukee, WI 53204,** is located on the North side of W. Historic Mitchell Street, East of S. 7th Street in Milwaukee, Wisconsin. The building has red brick on the front and gray/blue brick on the side. The entrance to the property is through the front entrance on the South side of the building. There is a red lettering "DUTTI FASHION" sign above the front entrance of the property.



39

## ATTACHMENT B

### *Property to Be Seized*

A.    Evidence, Fruits, and Instrumentalities of Subject offenses.

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 371 (conspiracy to commit an offense), and Title 18, United States Code , Section § 2320 (trafficking in counterfeit merchandise) (the "Subject Offenses") from May 1, 2019, to the present, described as follows:

- Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, statements, identification documents, address books, telephone directories, and keys.
- Evidence concerning the ownership and use of the electronic devices found in the Subject Premises, including without limitation, sales receipts, bills for internet access, and notes in computer manuals.
- Identification documents, correspondence, applications, loan documents, mail, account statements, bills, credit cards, financial records, and other documents in the name of, or addressed to, or referencing any person, which may be evidence of the use of aliases in the commission of fraud.
- Evidence concerning the operation of "Dutti Fashion" and "Jordan River Fashion," or other clothing, handbag, or accessories businesses.
- Financial records, including books, ledgers, credit card bills, and financial instruments related to Dutti Fashion. and Jordan River Fashion, or other clothing, handbag, or accessories businesses.
- Evidence concerning the receipt and disposition of criminal proceeds derived from the offenses, the creation and maintenance of financial accounts (including virtual currency accounts), tax returns, financial transfers and transactions, the possession of monetary instruments, and the disbursement of funds.
- Evidence concerning the statements, representations, and advertisements made to the general public, including lists of customers, communications with customers, and records of complaints and/or disputes by or about customers or prospective customers.
- Evidence concerning the link between Dutti Fashion" and "Jordan River Fashion."
- Documents referencing the names and employment of employees and/or owners of Dutti Fashion" and "Jordan River Fashion."
- Documents relating to vendors, suppliers, or sellers of goods to Dutti Fashion" and "Jordan River Fashion," including lists of vendors or sellers, communications with vendors or sellers, and records of complaints and/or disputes by or about vendors or sellers.
- Luxury clothing, handbags, and fashion accessories that appear to be counterfeit.
- Any safes, key-lock strong boxes, and other types of locked or closed containers that may contain any of the items described above, while will be opened and searched at the Subject Premises if reasonably feasible.
- Proceeds from the sale of counterfeit merchandise including bulk cash.

40

B. Computers or storage media used as a means to commit the violations described above.

1.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the lack of such malicious software;

d.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.    evidence of the times the COMPUTER was used;

i.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.    records of or information about Internet Protocol addresses used by the COMPUTER;

l.    records of or information about the COMPUTER's Internet activity,

41

including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

n. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.